UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

J.S. and R.S., and their daughter, B.F.,

    Petitioners/Plaintiffs,

    v.

OLYMPIA SCHOOL DISTRICT,

    Respondent/Defendant.

Case No. C04-5242FDB

ORDER DENYING APPEAL AND AFFIRMING ADMINISTRATIVE LAW JUDGE

**INTRODUCTION**

This matter is an appeal from a decision of an Administrative Law Judge (ALJ), State of Washington, Office of Administrative Hearings for The Superintendent of Public Instruction.

Plaintiffs seek reimbursement for the cost of two residential schools in which B.F. was placed at her parents' expense: Discovery Academy, in Provo, Utah (March – November 2001) and Mount Bachelor Academy, in Prineville, Oregon (July 2002 – December 2003); and a residential wilderness program/school B.F. (late December 2002 – January 2003). Plaintiffs contend that the Individuals With Disabilities Education Act (IDEA) and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a), require school district to fund residential placements and therapeutic services that students with disabilities need to receive an appropriate education.

ORDER - 1

Plaintiffs assert that this case is about how the Olympia School District's (District) failure to inform the parents of their options and to obtain information about B.F.'s disabilities from qualified professionals resulted in her being denied a free appropriate education. Plaintiffs assert that B.F., now 19 years old, has "longstanding and complex learning, processing and emotional/behavioral disabilities." *Plaintiffs' Opening Brief, p. 3.* Plaintiffs assert that the District provided B.F. limited services to address a learning disability under the IDEA from 1998 through March 2000. Plaintiffs assert that several of B.F.'s teachers submitted a written report of school performance and behavior problems of sufficient severity that the District's own psychologist admitted warranted referral for renewed IDEA eligibility, and that the District's failure to act on this information alone supports all relief that Plaintiffs seek.

Defendants contend that while Plaintiffs argue that the District should have known, during the limitations period, that B.F. was in need of special education services and thus should have evaluated her for eligibility, the real issue on appeal is as follows: whether the District fulfilled its child-find obligations with regard to B.F., who was not a special education student during the relevant time period, and whether the District complied with its obligations in evaluating B.F. for special education in June 2002.

Defendants contend that the ALJ correctly found that under the circumstances, the District reasonably did not perceive B.F. as being in need of special education services. Defendants contend that neither B.F.'s stepfather, who is a child psychiatrist who consults with school district on special education issues, nor Plaintiff's mother, who is a registered nurse, requested or even suggested that B.F. be evaluated for special education services. Defendants further contend that B.F.'s parents did not perceive B.F. as needing special education services even with full knowledge of the various evaluations they failed to share with the District.

Defendants point to the fact that prior to the limitations period, B.F.'s mother asked that B.F. be exited from special education and placed in regular education, B.F.'s multi-disciplinary team

ORDER - 2

approved this request, and B.F. earned a 2.8 GPA in general education classes. B.F.'s mother had regular contact with B.F.'s school counselor, never expressed concern over B.F. not receiving special education services, and never suggested or requested that B.F. be evaluated for special education. B.F.'s mother's concerns were about B.F. spending time with the wrong crowd, smoking marijuana, and skipping classes. Moreover, assert Defendants, despite taking B.F. to numerous mental health professionals for evaluation, the parents failed to provide the District with any of the evaluations until some time after May 2002 when they had already decided to unilaterally place B.F. in a private residential school. Defendants conclude by arguing that the District cannot be held accountable given that the parents willfully withheld information form the District.

## DISCUSSION

**Factual Background**

The Record herein provides the following pertinent information. B.F. was born February 14, 1985. Her father died in June 1994. Her mother remarried in 1995. B.F.'s stepfather is a child psychiatrist practicing in Olympia, Washington, and he has worked with a number of school districts over the years in the area of special education. B.F. has one older sister and three older step-brothers.

In 1995-1996 (B.F.'s fifth grade year, she was diagnosed with Attention Deficit Disorder (ADD). In March 1998, during B.F.'s seventh grade year, she was found eligible for special education for a learning disability in math. In fall 1998, B.F.'s mother mentioned to a teacher that B.F. had been diagnosed with ADD. In March 1999, B.F.'s Individual Education Program included accommodations addressing attention and organizational deficits, including preferential seating, organizing a notebook, keeping a daily assignment calendar, sending home progress reports, and providing extended time for testing.

ORDER - 3

In April 1999, unbeknown to the District, B.F.'s parents took her to the Amen Clinic in Fairfield, California for evaluation; the evaluation reflected that B.F. had ADD, anxiety, and a temporal lobe dysfunction.

In March 2000, at B.F.'s mother's request, B.F. was evaluated for the purpose of determining whether she could be exited from special education.  At the time of B.F.'s exit from special education, B.F.'s mother received written notice of procedural safeguards, including information on the parents' right to an independent educational evaluation and due process hearing. After B.F.'s exit from special education, she was provided with "Section 504" accommodations, which addressed B.F.'s inability to stay organized and on-task in the classroom.

B.F. finished the 1999-2000 school year (her ninth grade year) with a 2.8 grade point average.

In the fall of 2000, B.F. began using marijuana and truancy became a problem.  B.F.'s mother began periodic discussions with B.F.'s school counselor with whom she shared concerns about B.F.'s drug use, poor choice of friends, noncompliant behavior at home, and how those behaviors were affecting her school work and attendance.  The counselor recommended a drug and alcohol assessment at a hospital, and although B.F. was assessed, B.F. and her mother did not follow through on the recommendation that B.F. attend Alcoholics Anonymous and/or Narcotics Anonymous meetings.

In March 2001, B.F.'s mother told B.F.'s counselor that B.F.'s mother and step-father were sending B.F. to Discovery Academy in Provo, Utah, that B.F.'s mother wanted to get B.F. away from the people with whom she used drugs. B.F. attended Discovery Academy from March 2001 through November 2001.  While there, B.F. was evaluated by two psychologists, but the evaluations were not shared with the District prior to May 2002.

Prior to B.F.'s return to the District in December 2002, B.F.'s mother met with B.F.'s counselor to discuss a plan, and requested that B.F. be enrolled in the Running Start program, The

ORDER - 4

Running Start program allows 11th and 12th grade students to take high school and college classes simultaneously, and in order to qualify, a student must take the College Placement Test (CPT) and score at college level for English and reading.  B.F. passed the CPT and was enrolled in the program.

Beginning in about January 2002, B.F. was not functioning well in class and was not regularly attending her Running Start classes at the community college.  B.F.'s parents then had her evaluated by a psychiatrist.  Despite regular contact with B.F.'s counselor and contact concerning a Section 504 meeting, the parents did not inform the District of the psychiatrist's diagnoses and recommendations before May 2002.

In February 2002, B.F.'s mother met with District personnel to review B.F.'s Section 504 plan.  B.F.'s mother was given a copy of the procedural safeguards, which included information about parents' rights to reimbursement should parents place their special education child in a private school.  The parents did not provide to any District personnel evaluative reports from B.F.'s healthcare providers, nor did B.F.'s mother make any requests for different Section 504 or special education services.

In April 2002, B.F. received evaluations of two other mental health professionals, but the parents did not provide the evaluations or recommendations to the District.  Also, in April 2002, a Dr. Killoran evaluated B.F. again, and his evaluation this time diverged from his January 2002 evaluation.  Dr. Killoran testified that he wrote the August 2002 evaluation in order to assist the parents in getting financial assistance from the District for B.F.'s residential placement.  Dr. Killoran's assessments were not provided to the District before May 2002.

From January through June 2002, B.F. earned no credits: she received a D in high school English and a pass in high school French, and no credit in her Running Start classes.

In May 2002, B.F.'s mother told the counselor that she and her husband were considering enrolling B.F. in Mount Bachelor Academy (MBA) in Oregon for the reasons that their daughter had

ORDER - 5

been arrested for public urination at a May Day festival and that the mother was concerned that B.F. was seeing an older man. The mother did not ask or suggest that B.F. be evaluated for special education.

On May 28, 2002, the parents sent a letter to the District's Superintendent advising that they were withdrawing B.F. from the District and enrolling her at MBA. The letter stated that the parents believed that the District had not provided B.F. a proper educational placement and that they intended to seek reimbursement for the private placement.

On May 31, 2002, the parents wrote to the District's Director of Special Education stating that they did not think that B.F. was receiving an appropriate education in light of her "long established" diagnoses of ADD/ADHD, ODD, and LD. The letter also asked that the District evaluate B.F. for special education and place her in the private residential program at MBA. The parents requested an IEP team meeting be held on June 3, 2002.

B.F. did not return to school after May 2002.

On June 3, 2002, the District, after meeting with the parents, decided to conduct a special education evaluation of B.F. in a number of areas, and B.F.'s mother gave consent for the evaluations.

On June 7, 2002, for the first time, the District received medical documentation of an ADHD diagnosis of B.F. from her primary care physician, Dr. Megan Hubbard. Dr. Hubbard recommended that B.F. receive certain modifications in the regular classroom, but no specific recommendations for special education.

As part of the District's evaluation of B.F., the mother completed a social/developmental history form about B.F. and for the first time provided the District with information about B.F.'s treatment by numerous mental health professionals and that B.F. was being treated for ADD, ODD, OCD and anxiety.

ORDER - 6

Prior to the completion of the District's evaluation, the parents unilaterally placed B.F. at MBA, and since B.F. began attending MBA on July 1, 2002, she has not returned to the District for education since her withdrawal in May 2002.

The District invited B.F.'s parents to review the evaluation results on October 1, 2002, and B.F.'s mother attended that meeting.

B.F. continued at MBA in Oregon during the 2002-2003 school year, and she also participated in a wilderness camp at SUWS Adolescent Program in Idaho. B.F. returned to MBA in January 2003 and eventually graduated with a high school diploma in December 2003.

**Standard of Review**

In assessing the ALJ's decision, a reviewing court must "arrive[] at an independent judgment that the preponderance of the evidence supported the hearing officer's findings and conclusions." *Capistrano Unified School District v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995). The Court is not bound by a clear-error review standard, but "the court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue." *J.S. and T.S. v. Shoreline Sch. Dist.*, 220 F. Supp.2d 1175, 1183 (W.D. Wash. 2002). One factor is how thorough the administrative findings of fact and conclusions of law were. *See id.* At 484; *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir 1995). Another factor is whether the ALJ's findings are based on credibility determinations of live witness testimony. *See Amanda J. Ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 887-89 (9th Cir. 2001). In the latter case, and where the ALJ's findings are comprehensive, the ALJ's decision is entitled to substantial weight. *J.S. and T.S.*, 220 F. Supp.2d at 1184. The party challenging the ALJ's decision on appeal bears be burden of proof. *Id.*

**Statute of Limitations**

Plaintiffs argue that while the correct three-year limitations period was identified by the District, the period did not begin to run until the parents learned of their rights concerning funding

ORDER - 7

for residential placement. Plaintiffs also argue that even had the limitations period run from June 2000 (three years prior to the filing of the hearing request in June 2003), it includes the events that support the parents' claims that the District failed to notify them of all pertinent rights initiate a referral for evaluation of IDEA eligibility (which it should have done as of September 2000 regardless of her release from special education in March 2000).

Defendant argues that the parents filed their request for a due process hearing on May 16, 2003; thus, the parents are barred from bringing claims based on events occurring prior to May 16, 2000. The Defendant argues that the salient question is not what the District's obligation to a special education student would have been, but rather what the District's child-find obligation was relating to a regular education student with a § 504 plan in place.

After reviewing the parties' contentions and arguments as well as the ALJ's decision, the Court concludes that the ALJ properly rejected an attempt by the parents to challenge the appropriateness of B.F.'s being exited from special education in March 2000, and it was appropriate for the ALJ to analyze the issues that arose as of the 2000-2001 school year from the perspective of what duty the District owed a non-special education student who was provided with certain 504 accommodations that addressed B.F.'s inability to stay organized and on-task in the classroom. As the science/block teacher told B.F.'s mother, B.F. did not fit in with the special education class where the other students were physically disabled and much lower functioning intellectually than B.F., who had become bored and refused to complete work. The ALJ correctly applied the statute of limitations in this case.

**Child-Find Obligations**

Plaintiff argues that the District cannot evade scrutiny of its conduct by improperly remaining uninformed. Here, argues Plaintiff, the District's ignorance resulted from its failure to timely comply with its duties to initiate further assessment on its own (which would have resulted in more

ORDER - 8

information), or to inform the parents of rights that would have given them a reason to provide the District more information.

Defendant argues that during the limitations period (from May 16, 2000 forward) B.F. was not a special education student under the IDEA; rather, she had accommodations within the regular classroom under § 504. A District has child-find obligations only if the district suspects that a child is in need of special education services. *See* 34 C.F.R. §§ 300.128, 300.220; *see also, e.g.*, *Springsboro Comm. Sch. Dist.*, 41 IDELR 283 (June 25, 2004)(district did not violate child-find obligation where student's academic difficulties did not appear to be disability related). During the 2000 – 2002 time frame, no District personnel perceived B.F. as needing an evaluation for special education services under the IDEA. B.F.'s mother and the District were in agreement that B.F. did not need specialized instruction and that B.F.'s needs could be addressed with a Section 504 plan providing accommodations in the regular classroom, directed at organization and extra time for completion of her work.

The record reveals that B.F.'s final trimester of the 1999 – 2000 school year, in the regular education classroom, was one where she was not using drugs and where she had a 2.8 grade point average. In her 10th grade year (2000 – 2001), however, B.F.'s academic performance dropped coincidental to her drug use and truancy. During this period, when B.F.'s mother confided to B.F.'s counselor that B.F. was using drugs, spending time with a bad crowd, had gotten arrested for public urination, had conflicts with her step-father, and was possibly seeing an older man, B.F.'s counselor recommended to B.F.'s mother a drug treatment program for B.F.

B.F. was not a student in the District from March 2001 to November 2001, as she was attending Discovery Academy, a private residential school located in Provo, Utah. Upon return to the District in December 2001 and beginning the Running Start program, B.F. spent much of her time on a college campus, and the District had limited opportunity to observe or interact with B.F.

ORDER - 9

This record illustrates that the District reasonably did not perceive B.F.'s behavior as being indicative of an emotional disability that would qualify her for special education, rather that her behavior was reasonably related to drug usage. Drug usage and truancy does not necessarily mean that the child has a disability. *See, e.g., Dadnor Township Sch. Dist.*, 25 IDELR 1229 (March 19, 1997) (student's drug use, lack of school attendance and participation, and unwillingness to follow home rules did not lead to conclusion that student was emotionally disabled or that he was in need of specialized instruction.). B.F.'s mother's conduct reinforced the belief, and the mother never shared with the District any of the results of the various evaluations of B.F. by mental health professionals.

The ALJ correctly concluded that B.F.'s behaviors in themselves did not put the District on reasonable notice that B.F. was emotionally/behaviorally disabled and in need of special education.

**District's Obligations when Parents Removed B.F. from The State**

On May 28, 2002, B.F.'s parents withdrew her from the District and placed her in Oregon's Mount Bachelor Academy in May of 2002. Plaintiff argues that B.F. required placement in a residential school without delay for her well-being. Plaintiff argues that *J.S. v. Shoreline Sch. Dist.* 220 F. Supp.2d 1175 (W.D. Wa 2002) does not apply here, because in that case, since the district was providing a free appropriate public education (FAPE) at the time the student's parents withdrew him from the district, the court denied reimbursement for a unilateral residential placement. Plaintiff also contends that the District's testing was complete before B.F. was removed and placed at MBA on July 1, 2002, and that the District had conducted all its evaluations and merely waited several months before drafting its report.

The District argues that under the IDEA, school district have an obligation ro provide a free appropriate public education to disabled children residing within the state. *See* 34 C.F.R. § 300.121, § 300.220(a). This obligation extends to child-find activities and evaluation and re-evaluation of special education students. *See* C.F.R. § 300.125(a). State law determines residency for the purposes of the IDEA. *See J.S. and T.S. v. Shoreline Sch. Dist.*, 220 F. Supp. 2d 1175, 1192 (W.D.

ORDER - 10

Wash. 2002). In Washington, a student's residence is where the student lives. *See id.* A student's residence may be different that the principal abode of the student's parents. *See id.* Thus, concludes the District's argument, because B.F. ceased to be a Washington resident as of July 1, 2002, the District did not have an ongoing obligation under the IDEA to complete its evaluation of B.F. or develop or maintain an IEP for B.F.

Moreover, the District argues that once B.F.'s parents requested an evaluation on May 31, 2002, the District had 25 school days to make a determination of whether the student should be evaluated. *See* WAC 392-172-104. The District notified the parents the next business day, June 3, 2002 that it would begin to evaluate B.F. for eligibility for special education services. The parents consented to the evaluation on June 4, 2002. This evaluation must be completed within 35 school days of receipt of the parent's written consent. *See* WAC 392-172-104(1), (2). On June 4, 2002, there were fewer than 35 school days left in the school year, and the evaluation, therefore, would have been due in early October 2002.

The District's arguments have merit, and a review of the record is convincing that the ALJ appropriately concluded that the District was providing a FAPE at the time of B.F's removal from the District and was also appropriately evaluating B.F. at that time, during the fifteen days that it had until the end of the school year. The District then worked to complete the evaluation, and so advised the parents and invited them to review the evaluation results on October 1, 2002.

## CONCLUSION

In accordance with the foregoing discussion, the Court concludes that the District fulfilled its child-find obligations as to B.F. and complied with its obligations in evaluating B.F. in June 2002. A preponderance of the evidence supported the Administrative Law Judge's findings and conclusions. Additionally, it is noted that the ALJ heard live testimony from 14 witnesses over five days, and the ALJ's determinations as to witness credibility is accorded substantial weight. The ALJ's decision is

ORDER - 11

comprehensive and well-reasoned.    Accordingly, Plaintiff's appeal will be denied and the ALJ is affirmed.  NOW, THEREFORE,

IT IS ORDERED:

1. Plaintiff's appeal of the Administrative Law Judge's decision is DENIED, and

2. The Decision of the Administrative Law Judge is AFFIRMED.

DATED this 11th day of April, 2005.

FRANKLIN D. BURGESS
UNITED STATES DISTRICT JUDGE

ORDER - 12